## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

JAMES CODDINGTON,         )
                                 )
            Petitioner,     )
vs.                         )           NO. CIV-11-1457-HE
                                 )
TERRY ROYAL, Warden,     )
          Oklahoma State Penitentiary,   )
                                 )
            Respondent.[1]    )

## MEMORANDUM OPINION

Petitioner, James Coddington, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 29.[2] Petitioner, who is represented by counsel, is challenging the convictions entered against him in Oklahoma County District Court Case No. CF-97-1500.

Petitioner's first trial was held in 2003. The jury found petitioner guilty of murder in the first degree (malice aforethought) and robbery with a dangerous weapon after former conviction of two or more felony crimes. Petitioner was sentenced to death for the murder. He received a life sentence for the robbery (2003 O.R. VII, 1255-57, 1260-61; 2003 O.R. VIII, 1458-60).[3] In <u>Coddington v. State</u>, 142 P.3d 437 (Okla. Crim. App. 2006), <u>cert. denied</u>, 549 U.S. 1361 (2007), the Oklahoma Court of Criminal

---

[1] *Pursuant to Fed. R. Civ. P. 25(d), Terry Royal, who currently serves as warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent.*

[2] *Doc. 29 is petitioner's amended petition, which was filed to correct certain scrivener's errors.*

[3] *Because petitioner had two direct appeal proceedings (OCCA Case Nos. D-2003-887 and D-2008-655), the state court record contains two sets of the original record. The first original record is eight volumes, and it will be referred to as "2003 O.R." The second original record is six volumes, and it will be referred to as "2008 O.R."*

Appeals (hereinafter "OCCA") affirmed both of petitioner's convictions and his life sentence for robbery, but finding error in the second stage, it remanded the case for resentencing on the murder conviction.[4]

The resentencing trial was held in 2008. Once again, petitioner was sentenced to death. In support of his sentence, the jury found four aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed to avoid or prevent a lawful arrest or prosecution; (3) petitioner had previously been convicted of a felony involving the use or threat of violence to the person; and (4) the existence of a probability that petitioner will commit criminal acts of violence that would constitute a continuing threat to society (2008 O.R. V, 837-838, 914-16). In Coddington v. State, 254 P.3d 684 (Okla. Crim. App. 2011), cert. denied, 132 S. Ct. 588 (2011), the OCCA affirmed petitioner's death sentence, and in Coddington v. State, 259 P.3d 833 (Okla. Crim. App. 2011), the OCCA denied petitioner's application for post-conviction relief.

Petitioner has presented nine[5] grounds for relief. Respondent has responded to the petition and petitioner has replied. Docs. 39 and 49. In addition to his petition, petitioner has filed motions for discovery and an evidentiary hearing. Docs. 30 and 31. After a thorough review of the entire state court record (which respondent has provided), the

---

[4] *Because the OCCA granted petitioner relief on direct appeal, his related post-conviction appeal was subsequently dismissed as moot. Order Dismissing Post-Conviction Appeal, Case No. PCD-2003-1029 (Okla. Crim. App. Sept. 28, 2006).*

[5] *Petitioner has numbered his grounds for relief as Ground IV through Ground XII.*

pleadings filed in this case, and the applicable law, the court concludes that, for the reasons set forth here, petitioner is not entitled to habeas relief.

## I. Facts.

In adjudicating petitioner's first direct appeal, the OCCA set forth a summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted by petitioner, the court finds that petitioner has not done so, and that in any event, the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

> In early March of 1997, [petitioner], a cocaine addict, suffered a relapse and began using cocaine again. He estimated he spent one thousand dollars ($1000.00) a day to support his habit. Within a short time, he was desperate for money and robbed a convenience store on March 5, 1997 to feed his habit. The robbery did not yield enough money, so [Petitioner] went to his friend Al Hale's home to borrow fifty dollars ($50.00).

> Hale, then 73 years old, worked with [petitioner] at a Honda Salvage yard. Hale had previously loaned [petitioner] money and had also contributed towards [petitioner's] previous drug treatment. Hale's friends and family knew he kept a large amount of cash at his home. On March 5, 1997, he had over twenty-four thousand dollars ($24,000.00) stashed in his closet.

> [Petitioner] went to Hale's home on the afternoon of March 5, 1997 to borrow money, because he had been on a cocaine binge for several days and needed money for more cocaine. [Petitioner] watched television with Hale for an hour or two and then smoked crack cocaine in Hale's bathroom. Hale knew [petitioner] was using cocaine again. Hale refused to give him money and told him to leave. As he was leaving, [Petitioner] saw a claw hammer in Hale's kitchen, grabbed it, turned around and hit Hale at least three times with the hammer. [Petitioner] believed Hale was dead, so he took five hundred twenty-five dollars ($525.00) from his pocket and left. Following the attack on Hale, [petitioner] robbed five more convenience stores to get money for cocaine.

Oklahoma City police detectives arrested [petitioner] on March 7, 1997, outside of his apartment in south Oklahoma City. [Petitioner] told one officer he had been on a cocaine binge. On the way to the police department, [petitioner] tried to choke himself by wrapping the seat belt around his neck. He also stated he wanted to die. At the police station, during an interview with a robbery detective and a homicide detective, [petitioner] confessed to the convenience store robberies and also to the murder of Mr. Hale. He admitted he struck Mr. Hale in the head with a claw hammer and believed Hale was dead when he left. At trial, [petitioner] admitted he murdered Hale. He testified he did not go to Hale's house with the intent to do anything except borrow money to buy more cocaine. He said he did not have a weapon with him, did not intend to rob Hale, and did not intend to kill him.

Ron Hale, the victim's son, discovered Hale after the attack on the evening of March 5, 1997. There was blood and blood spatter everywhere. Hale was lying in his bed, soaked in blood, still breathing but unable to speak. Hale was transported first to Midwest City Hospital and then to Presbyterian Hospital. He died approximately twenty-four hours later. An autopsy showed Hale died from blunt force head trauma. The medical examiner testified he sustained at least three separate blows to the left side of his head, consistent with being hit in the head with a claw hammer. He also testified Hale had defensive wounds.

[Petitioner] admitted that he did not call the police when he left Hale's house because he did not want to get caught. He also admitted he had prior felony convictions.

Coddington, 142 P.3d at 442-43.

## II. Standard of Review.

### A. Exhaustion as a Preliminary Consideration.

The exhaustion doctrine, a matter of comity which has long been a part of habeas corpus jurisprudence, requires the court to consider in the first instance whether petitioner has presented his grounds for relief to the OCCA.  As the Supreme Court stated in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."  The exhaustion doctrine is set forth in 28 U.S.C. § 2254(b). Section 2254(b)(1)(A) prohibits the court from *granting* habeas relief in the absence of exhaustion (although Section 2254(b)(1)(B) sets forth two limited exceptions to this rule), but Section 2254(b)(2) expressly authorizes the court to *deny* habeas relief "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### B. Procedural Bar.

Beyond the issue of exhaustion, the court must also examine how the OCCA adjudicated each of petitioner's grounds for relief, i.e., whether the OCCA addressed the merits of petitioner's grounds or declined to consider them based on a state procedural rule.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729). "The doctrine applies to bar federal habeas [relief] when a state court declined to address

a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

### C. Limited Merits Review.

When the OCCA has addressed the merits of one of petitioner's grounds for relief, the court reviews that ground in accordance with the standard of relief set forth in 28 U.S.C. § 2254(d). Pursuant to that section of the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order for petitioner to obtain relief, he must show that the OCCA's adjudication of his claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (acknowledging that "[t]he petitioner carries the burden of proof"). The very focus of this statutory provision is the reasonableness of the OCCA's decision. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). In other words, "[i]t is not enough that [this] court, in its independent review of the legal question, is left with a firm conviction that the [OCCA] was erroneous." What is required is a showing that the OCCA's decision is "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted).

The Supreme Court has repeatedly acknowledged that Section 2254(d) "'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court[,]'" and that "[i]f [it] is difficult to meet, that is because it was meant to be." White v. Wheeler, 577 U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting Burt v. Titlow, 571 U.S. ___, 134 S. Ct. 10, 16 (2013)); Harrington v. Richter, 562 U.S. 86, 102 (2011). Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Richter, 562 U.S. at 102. What remains, then, is a very narrow avenue for relief, one that permits relief only "*where there is no possibility* fairminded jurists could disagree that the [OCCA's] decision conflicts with [the Supreme] Court's precedents." Id. (emphasis added).

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 102-03 (citation omitted).

### III. Analysis.

**A.  Ground IV:  Trial Court's Exclusion of Expert Testimony Regarding Petitioner's Inability to Form Malice Aforethought.**

In his first ground for relief, petitioner asserts that he was denied his right to present a defense when the trial court improperly limited his expert's testimony. Petitioner raised this claim on direct appeal, and although the OCCA agreed with petitioner that error had occurred, it found the error harmless and denied

relief. <u>Coddington</u>, 142 P.3d at 448-51. Petitioner challenges the OCCA's harmless error analysis, asserting that it is an unreasonable application of <u>Chapman v. California</u>, 386 U.S. 18 (1967), and that he is entitled to relief under <u>Fry v. Pliler</u>, 551 U.S. 112 (2007), and <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), because the error had a substantial and injurious effect on the jury's verdict. Respondent, while asserting that AEDPA deference applies to the resolution of this claim, argues that relief must be denied because there is no Supreme Court case on point. In the alternative, respondent argues that petitioner cannot meet the <u>Brecht</u> standard for relief. Applying <u>Brecht</u>, the court denies relief.

Dr. John R. Smith, a psychiatrist, testified in the guilt stage of petitioner's first trial regarding petitioner's cocaine addiction (2003 Tr. V, 52, 81).[6] Dr. Smith advised the jury that cocaine addiction is a brain disease, that cocaine is a highly addictive substance, and that given his history, petitioner was an individual who was vulnerable to addiction (2003 Tr. V, 62-66, 68-69, 71-72, 74-78). Dr. Smith discussed how addiction is treated and how relapses are common (2003 Tr. V, 78-80). He told the jury that cocaine affects all parts of the brain, but particularly how a person thinks (2003 Tr. V, 81-82). Dr. Smith testified that cocaine can cause paranoia, fidgetiness, and anxiety (2003 Tr. V, 88-89). Having reviewed petitioner's videotaped confession with police, it was Dr. Smith's opinion that petitioner was high at that time (2003 Tr. V, 92-93).

---

[6] *The first trial will be referred to as "2003 Tr." and the second trial as "2008 Tr."*

Regarding petitioner's mental state on the day of the murder, Dr. Smith testified that petitioner told him that he had smoked a gram of crack cocaine with marijuana and drank some alcohol as well. After discussing the synergistic effect of this combination of intoxicants (2003 Tr. V, 93-94), Dr. Smith testified that petitioner's ability to make decisions on the day of the murder was impacted, as was his ability to control his behavior. Describing petitioner as agitated and overreactive, Dr. Smith stated that petitioner's "ability to delay discharge behaviorally" and "his ability to be thoughtful or think" were "certainly affected" (2003 Tr. VI, 4). Dr. Smith testified regarding the cocaine binge petitioner was on at the time and explained why petitioner's ability to recall the details of the murder was not inconsistent with being under the influence of cocaine (2003 Tr. VI, 5-6). Defense counsel ended direct examination of Dr. Smith with the following question: "So, Dr. Smith, what can you infer to a reasonable degree of medical certainty on the 5th day of March, 1997, in regards to whether [petitioner] was thinking reasonably and rationally?" Dr. Smith replied, "I can think he was not" (2003 Tr. VI, 6).

Although Dr. Smith's testimony clearly weighed in on the issue of whether or not petitioner's cocaine use affected his ability to form the intent to kill, defense counsel advocated for more, and in response to the trial court's ruling limiting Dr. Smith's testimony, made the following offer of proof:

> If permitted to testify as to the effect of [petitioner's] cocaine addiction and his ability to form malice aforethought Dr. Smith would testify that on 5 March in his opinion that to a reasonable degree of medical certainty [petitioner] would not have been able to form the intent of malice aforethought and that he would have been experiencing the effects of the

cocaine to such a degree that the brain would be unable to formulate that specific intent . . . .

(2003 Tr. V, 35-38, 80-81).  As noted above, when petitioner argued on direct appeal that the trial court committed error in preventing Dr. Smith from giving this additional testimony, the OCCA agreed.  The OCCA found that:

> The normal experiences and qualifications of laymen jurors likely do not provide an understanding of the effects of cocaine intoxication on one's ability to control behavior, to think rationally, and to form an intent to kill. An expert's opinion on the effects of cocaine intoxication would have been helpful to the trier of fact. While Dr. Smith could not, under our case law, tell the jury what result to reach, Dr. Smith could properly have testified that, in his expert medical opinion, [petitioner] would have been unable to form the requisite malice.
>
> . . . .
>
> Here, [petitioner] raised sufficient evidence for the trial court to instruct the jury on his defense of voluntary intoxication. When a defendant raises the defense of voluntary intoxication, an expert may properly offer his or her opinion on whether the defendant's actions were intentional. Dr. Smith could have properly testified that, in his opinion and based upon his specialized knowledge, he believed [petitioner] would have been unable to form the requisite deliberate intent of malice aforethought. The trial court erred and abused its discretion by sustaining the Motion in Limine and so limiting the expert witness' testimony.

Coddington, 142 P.3d at 449, 450 (citations omitted).  Nevertheless, the OCCA determined that the error was harmless beyond a reasonable doubt and denied relief.  Id. at 450-51 (citing Chapman, 386 U.S. at 24).

Although the OCCA applied the Chapman harmless error test, this court's review is governed by "the more forgiving standard of review" set forth in Kotteakos v. United States, 328 U.S. 750 (1946), and adopted in Brecht, 507 U.S. at 638, as the appropriate standard to apply to cases on collateral review.  Fry, 551 U.S. at 116, 121-22.  Under

Kotteakos, 328 U.S. at 776, the test is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict."  The Supreme Court elaborated on the standard as follows:

> But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

Id. at 765.  "By 'grave doubt' [the Supreme Court] mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."  O'Neal v. McAninch, 513 U.S. 432, 435 (1995) (referring to the term employed in Kotteakos) (parenthesis omitted).

The court concludes that the trial court's error[7] in limiting Dr. Smith's testimony did not have a substantial and injurious effect on the jury's verdict.  First and foremost, although Dr. Smith was not allowed to testify to the issue of intent more directly, he did offer extensive testimony on the effects of cocaine addiction, and he was permitted to give the jury his medical opinion regarding petitioner's mental state at the time of the murder.  In no uncertain terms, Dr. Smith told the jury that petitioner was not "thinking reasonably and rationally" when he attacked the victim with a hammer (2003 Tr. VI, 6). This testimony, along with the instructions given to the jury regarding the defense of

---

[7] *Contrary to respondent's assertion, the court concludes that petitioner's claim is based on his federal constitutional right to present a defense.* See Holmes v. South Carolina, *547 U.S. 319, 324 (2006) (discussing Supreme Court authority related to a criminal defendant's federal constitutional right to a meaningful opportunity to present a complete defense).  Thus, a* Brecht *analysis is appropriate.*

involuntary intoxication (2003 O.R. VII, 1328-32), gave the jury the option to find petitioner not guilty of malice murder.  Second, the record reflects that petitioner was charged with two forms of murder in the first degree, malice murder and felony murder (2003 O.R. I, 6-9).  Although intent is required to prove malice murder, a murder committed during the commission of a robbery with a dangerous weapon is a general intent crime to which voluntary intoxication affords no defense (2003 O.R. VII, 1316, 1328, 1331, 1333-35).  See Hammon v. State, 999 P.2d 1082, 1098 (Okla. Crim. App. 2000) (acknowledging that the voluntary intoxication defense applies only to specific intent crimes and that felony murder/robbery with a dangerous weapon is a general intent crime).  It necessarily follows that even if Dr. Smith had been permitted to testify to the ultimate issue of petitioner's intent, and even if the jury had been persuaded by such testimony, the result would have been the same.  Having found petitioner guilty of both malice murder and robbery with a dangerous weapon, the court has little doubt that even if the jury found petitioner incapable of forming the intent as required for a malice murder conviction, it would have nevertheless found petitioner guilty of first degree murder, albeit felony murder.  For these reasons, the court concludes that the error related to Dr. Smith's testimony did not have a substantial and injurious effect on the jury's verdict and is therefore harmless.  Petitioner's Ground IV does not state a basis for relief.

**B.    Ground V:   Admissibility of Petitioner's Videotaped Confession.**

In his Ground V, petitioner argues that his videotaped confession should not have been admitted because his <u>Miranda</u>[8] waiver was invalid.  Petitioner raised this claim on direct appeal, but the OCCA denied relief.  <u>Coddington</u>, 142 P.3d at 446-48.  Petitioner argues that the OCCA's opinion is an unreasonable application of <u>Miranda</u> and <u>Moran v. Burbine</u>, 475 U.S. 412 (1986), as well as an unreasonable determination of the facts.  Respondent contends that petitioner must be denied relief because he has failed to meet the AEDPA standard for relief.  The court agrees with respondent.

In <u>Miranda</u>, 384 U.S. at 444, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  <u>Miranda</u> therefore requires that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  <u>Id.</u>   After being advised of these rights, however, the defendant may waive them, "provided the waiver is made voluntarily, knowingly and intelligently."  <u>Id.</u>  Whether a valid waiver has been effectuated is dependent upon the inquiry of "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of

---
[8] <u>*Miranda v. Arizona,*</u> *384 U.S. 436 (1966).*

the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Burbine</u>, 475 U.S. at 421. The OCCA applied this Supreme Court authority in its adjudication of petitioner's claim. <u>Coddington</u>, 142 P.3d at 447. Therefore the question this court must answer is whether the OCCA did so unreasonably. "[I]f all fairminded jurists would agree the [OCCA] was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the [OCCA], then it was not unreasonable and the writ should be denied." <u>Frost v. Pryor</u>, 749 F.3d 1212, 1225 (10th Cir. 2014).

Petitioner's first contact with law enforcement came two days after the murder when some Oklahoma City Police Officers assigned to the robbery unit confronted petitioner at his apartment complex about his involvement in multiple robberies. While standing outside petitioner's apartment, petitioner told the officers, "You guys have caught me. I did all of those robberies. I should have pulled that knife and made you guys kill me. I'm not going back to prison." These incriminating statements prompted Oklahoma City Police Officer Roger Smart to give petitioner his <u>Miranda</u> rights. Using a standard form, Officer Smart read petitioner his rights. Petitioner acknowledged his understanding of these rights and he told Officer Smart that he desired to waive them. He then signed the waiver of rights portion of the form.[9] Petitioner was questioned about the robberies as they stood outside his apartment. Regarding petitioner's appearance and demeanor at that time, Officer Smart testified that although petitioner was upset, agitated,

---

[9] *Petitioner also consented to a search of his apartment (State's Exhibit 33).*

and repetitive, petitioner did not appear to be drunk or high, that he was appropriately dressed, that he walked normally, and that he was "coherent of his environment." Officer Smart further testified that petitioner's waiver was not the result of any promises or threats (2003 Tr. III, 212-21, 224, 232-35; 2003 Tr. IV, 63-67, 70-78, 87; State's Exhibit 34).

Later, petitioner was taken downtown and interviewed by Oklahoma City Police Officer Glen DeSpain, who like Officer Smart was a part of the robbery unit, and Choctaw Police Officer Wes Weaver, who wanted to talk to petitioner about the murder. This interview was videotaped. Officer DeSpain testified that he did not read petitioner his <u>Miranda</u> rights because he had been told by Officer Smart that petitioner had already waived his <u>Miranda</u> rights. Officer DeSpain was in possession of the waiver petitioner had signed earlier that day, and at the start of the interview, Officer DeSpain asked petitioner if he remembered being advised of his rights. Petitioner responded affirmatively. Officer DeSpain testified that although petitioner was shaking and cried a couple of times during the interview, his demeanor was not out of the ordinary, that he did not appear to be under the influence, and that he was talkative, rational, alert, and coherent. Like Officer Smart, Officer DeSpain also testified that petitioner's interview was not the result of promises or threats. In the course of this interview, petitioner confessed to the murder (2003 Tr. III, 221-22, 245-49; 2003 Tr. V, 7-14; State's Exhibit 88; Court's Exhibit 2).

In his first challenge to the admission of his confession, petitioner contends that his waiver was invalid because he was not advised that the police wanted to talk to him

about the murder.  Labeling this failure to advise as a misrepresentation, petitioner argues that his confession should not have been admitted.  In addition to his reliance on <u>Miranda</u> and <u>Burbine</u>, petitioner supports this argument with citation to <u>Lynumn v. Illinois</u>, 372 U.S. 528 (1963), and <u>Spano v. New York</u>, 360 U.S. 315 (1959).

Both <u>Lynumn</u> and <u>Spano</u> are inapposite.  In <u>Lynumn</u>, 372 U.S. at 534, the Supreme Court found a defendant's confession to be involuntary because it was given only after the police told the defendant that her failure to cooperate would result in the loss of governmental assistance and the custody of her small children.  In <u>Spano</u>, 360 U.S. at 317-24, the Supreme Court found a defendant's confession to be involuntary where he endured eight nighttime hours of nonstop questioning by multiple law enforcement officials, all the while refusing to talk on the advice of counsel and confessing only after the police utilized a police cadet, one of the defendant's childhood friends, to play upon the defendant's sympathies. Not only are the circumstances under which petitioner confessed in no way similar to those addressed in <u>Lynumn</u> and <u>Spano</u>, but the Supreme Court's decision in <u>Colorado v. Spring</u>, 479 U.S. 564 (1987), a case upon which the OCCA relied to deny petitioner relief, clearly undercuts petitioner's position.

In <u>Spring</u>, 479 U.S. at 577, the Supreme Court specifically held "that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."  With reference to <u>Spring</u>, the OCCA rejected petitioner's argument as follows:

There is no question that [petitioner] was informed of his <u>Miranda</u> rights and waived them. He exhibited no reluctance in speaking with the detectives about the robberies or the homicide. In fact it was he who volunteered statements about the homicide and initiated the discussion about the homicide.[10] The relevant inquiry is whether the suspect understands the rights at stake and the consequences of waiving them. <u>Colorado v. Spring</u>, 479 U.S. at 573, 107 S.Ct. at 857. His "awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." <u>Id.</u>, 479 U.S. at 577, 107 S.Ct. at 859.

<u>Coddington</u>, 142 P.3d at 448. Clearly, the OCCA's decision here was not unreasonable.

Next, petitioner asserts that his confession was involuntary due to his mental state. Petitioner argues that because he had been on a cocaine binge, had not eaten in three days, had not slept, confessed to other crimes that could not be substantiated, was physically shaking and suicidal and, because the trial judge believed that he was intoxicated at the time he gave his videotaped confession, the confession should not have been admitted. Because the OCCA found otherwise, petitioner contends that its determination is both an unreasonable application of the law and the facts.

In rejecting this argument, the OCCA held as follows:

"[S]elf-induced intoxication, short of mania, or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words, will not render a confession inadmissible, but goes only to the weight to be accorded to it." [Petitioner] gave specific details about both the robberies and the murder of Mr. Hale, and appeared to understand exactly what was going on. That he also confessed to crimes which could not be corroborated does not show he was so intoxicated that his <u>Miranda</u> waiver was not knowingly and voluntarily made. Further, from

_____

[10] *Before questioning began, and even before Officer DeSpain talked to petitioner about his earlier waiver, petitioner told Officers DeSpain and Weaver, "You're gonna want the murder weapon, I'm sure . . . ." Later, petitioner also told them that they "need[ed] to get homicide down [there]" (State's Exhibit 88; Court's Exhibit 2, pp. 2, 12).*

his prior contacts with law enforcement and prior convictions, we can assume he was familiar with and understood the "concepts encompassed in <u>Miranda</u>."

[Petitioner] simply has not shown his <u>Miranda</u> rights waiver was not knowingly and voluntarily made. The admission of his confession and the physical evidence derived therefrom did not deprive [petitioner] of his state or federal constitutional rights.

<u>Coddington</u>, 142 P.3d at 448 (citation omitted). For the following reasons, the OCCA's determination is not unreasonable.

Although the trial court did find that petitioner was "in some sort of heightened state of intoxication" when he spoke to Officers DeSpain and Weaver (2003 Tr. IV, 12), the Tenth Circuit has acknowledged that "intoxication does not automatically render a statement involuntary. The test is whether [petitioner's] will was overcome, or whether the statement was freely made." <u>United States v. Muniz</u>, 1 F.3d 1018, 1022 (10th Cir. 1993) (citations omitted). And despite finding that petitioner was intoxicated, the trial court's ultimate conclusion was that petitioner's will was not overborne by police action:

I don't think based on what I saw from the videotape that he was threatened, promised, coerced by the police officers in this case. The evidence has been – and I think the state is admitting that he has – or based on what I heard from the testimony yesterday that he did give some statements that could not be borne out by investigation. However, there were other things that did – that were borne out by the investigation. Finding of the hammer, the murder weapon in this case, were [sic] borne out by the investigation.

Simply because he gives some consistent and some inconsistent statements I don't think that the statement was made against his will in response to force, threat, or promise. I was thinking about this. And what's the spirit of Miranda? I mean, the spirit of Miranda is to make sure that the police don't sleep-deprive people, take rubber hoses to them, do things that we as a society just don't think should be done to people.

(2003 Tr. IV, 13). This ruling is consistent with Colorado v. Connelly, 479 U.S. 157 (1986), wherein the Supreme Court held "that coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167 (internal quotation marks omitted). See also Burbine, 475 U.S. at 421 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.").

Regarding petitioner's laundry list of reasons why his mental state was compromised when he spoke to Officers DeSpain and Weaver, petitioner's argument appears to be that because the OCCA did not ultimately find that these circumstances rendered his confession involuntary, the OCCA unreasonably determined the facts. In this same vein, petitioner additionally asserts that the OCCA unreasonably determined the facts because it (1) relied on the testimony of Officers Smart and DeSpain who testified that he was not intoxicated and (2) focused on the fact that he was intoxicated by his own volition.

A review of the OCCA's opinion reveals that it was well-aware of all of the circumstances surrounding petitioner's confession, including the fact that the trial court held an opinion that contradicted the officers' testimony. While the OCCA noted the officers' testimony (and the undisputed fact that petitioner was *voluntarily* intoxicated), its decision did not rise or fall on these matters. See Grant v. Trammell, 727 F.3d 1006, 1023-24 (10th Cir. 2013) (emphasizing the "based on" language of 28 U.S.C. § 2254(d)(2) and noting that findings which "concerned only subsidiary issues that the

OCCA mentioned in passing" would not satisfy it).  What the OCCA did conclude was that petitioner's "fatigue and hunger from drug usage [did] not render his waiver of Miranda involuntary[,]" Coddington, 142 P.3d at 448, and this is not an unreasonable determination of the facts.

Petitioner also faults the OCCA for not equating his unsubstantiated admissions to other crimes as evidence of his lack of awareness and for imputing familiarity with the criminal system based on his prior criminal history.  Despite petitioner's admissions to criminal activity which the police could not substantiate, the OCCA also noted that petitioner gave the police crime details which were completely accurate (including the murder weapon he used to kill Mr. Hale and where he disposed of it).  Id.  In light of this mixed bag of accurate and unsubstantiated information, it was not unreasonable for the OCCA to discount the same as it related to petitioner's mental functioning.  As for petitioner's prior interaction with the criminal justice system, this is clearly relevant information that the OCCA could consider in determining voluntariness.  See Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004) (noting that the petitioner's "prior experience with the criminal justice system . . . [meant that] [t]he concepts encompassed by Miranda were not foreign to him").

For the foregoing reasons, the court concludes that petitioner has failed to demonstrate that the OCCA unreasonably denied his Miranda claim.  Ground V does not warrant habeas relief.

**C.    Ground VI:        Double Jeopardy.**

In Ground VI, petitioner contends that a double jeopardy violation occurred when the state was allowed to pursue the continuing threat aggravator in his resentencing proceeding. Because the jury rejected the continuing threat aggravator in his first trial, petitioner argues that jeopardy attached and the state was prevented from seeking this aggravator a second time.   Petitioner raised this claim in the direct appeal that followed his resentencing.  Relying on its decision in Hogan v. State, 139 P.3d 907 (Okla. Crim. App. 2006), wherein the OCCA thoroughly analyzed Supreme Court authority addressing this issue, the OCCA denied petitioner relief.   Coddington, 254 P.3d at 706-07. Petitioner contends that the OCCA's Hogan decision, and its application in this case, is an unreasonable application of Sattazahn v. Pennsylvania, 537 U.S. 101 (2003).

In Sattazahn, the prosecutor sought the death penalty, but because the jury could not agree as to the defendant's sentence, the trial court imposed a life sentence as required by Pennsylvania law.  After the defendant successfully appealed his conviction, the prosecution sought the death penalty again.  This time, the defendant was sentenced to death.  Id. at 103-05.  Although the defendant argued that the double jeopardy clause prevented the prosecution from seeking the death penalty in his retrial proceeding, the Supreme Court disagreed.  Examining precedent, including Poland v. Arizona, 476 U.S. 147 (1986), Arizona v. Rumsey, 467 U.S. 203 (1984), and Bullington v. Missouri, 451 U.S. 430 (1981), the Supreme Court stressed that "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.'"  Because the jury did not reach a verdict on the issue of punishment in the

defendant's first trial, the Supreme Court found that the defendant had not been acquitted of the death penalty and therefore his subsequent sentence of death was valid. Sattazahn, 537 U.S. at 106-09.

With consideration of Sattazahn, as well as Poland, Rumsey, and Bullington, the OCCA has found that when an Oklahoma jury returns a death verdict in a defendant's original trial, double jeopardy concerns are not implicated with respect to the aggravating circumstances. The OCCA has concluded that because the defendant was not acquitted of the death penalty in the first proceeding, the state may pursue a death sentence a second time based on any aggravating circumstances that apply, including those which the jury failed to find in the first proceeding. Hogan, 139 P.3d at 926-30. Petitioner has not shown that the OCCA's determination of this issue is unreasonable. See Romano v. Gibson, 239 F.3d 1156, 1178-79 (10th Cir. 2001) (applying Poland and rejecting a similar argument); Mitchell v. Duckworth, No. CIV-11-429-F, 2016 WL 4033263, at *26-28 (W.D. Okla. July 27, 2016) (finding that the OCCA's decision in Hogan is not unreasonable); Hanson v. Sherrod, No. 10-CV-0113-CVE-TLW, 2013 WL 3307111, at *22-24 (N.D. Okla. July 1, 2013) (concluding that the OCCA did not unreasonably apply Poland based on the reasoning employed in Hogan). Ground VI does not state a basis for relief.

### D.    Ground VII:    Ineffective Assistance of Trial Counsel.

In Ground VII, petitioner challenges the representation he received in his original trial and in his resentencing proceeding. As related to the guilt stage, petitioner asserts that trial counsel could have done more to substantiate his intoxication and, had they

done so, his confession (and other evidence) would not have been admitted.  Regarding resentencing, petitioner argues that trial counsel should have presented more evidence regarding his intoxication at the time of the crime and should have listed this circumstance as one of his mitigating circumstances.  For the following reasons, the court concludes that none of these claims warrant relief.

## Procedurally Barred Claims

Petitioner faults both his original trial counsel and his resentencing trial counsel for not presenting a witness (Kenneth "Hippy" Johnson) to testify about petitioner's drug usage before and after the murder.  The problem with this claim is that it has never been presented to the OCCA, and if petitioner were to return to state court in order to exhaust it, the OCCA would apply a procedural bar to prevent consideration of its merits.  See Okla. Stat. tit. 22, § 1089(D)(8).  Under these circumstances, an anticipatory procedural bar applies.  See Cole v. Trammell, 755 F.3d 1142, 1169 (10th Cir. 2014) (citing Anderson v. Sirmons, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007), and acknowledging the applicability of an anticipatory procedural bar).  Petitioner can, however, overcome the application of a procedural bar to this claim if he can satisfy one of two exceptions.  Frost, 749 F.3d at 1231.

One exception is cause and prejudice.  This exception requires petitioner to demonstrate that some external objective factor, unattributable to him, prevented his compliance with the procedural rule in question.  Spears v. Mullin, 343 F.3d 1215, 1255 (10th Cir. 2003).  He must also show that the failure resulted in actual prejudice. Thornburg v. Mullin, 422 F.3d 1113, 1141 (10th Cir. 2005).  In his reply,

petitioner asserts that his default of this claim should be excused due to ineffective assistance of appellate counsel. Reply, p. 10. However, this is insufficient to overcome a procedural bar to this claim. What petitioner must show is why he did not raise this claim in his original post-conviction proceeding, and appellate counsel's actions have no bearing on this issue.[11] Petitioner has therefore failed to satisfy this exception.

The second exception is a fundamental miscarriage of justice. "This exception applies to those who are actually innocent of the crime of conviction and those 'actually innocent' of the death penalty (that is, not eligible for the death penalty under applicable law)." Black v. Workman, 682 F.3d 880, 915 (10th Cir. 2012) (citation omitted). In his reply, petitioner asserts his actual innocence for both the murder and his death sentence. For his conviction, petitioner argues that if his intoxication had been sufficiently proven, his confession and other evidence would not have been admitted against him. As for his sentence, petitioner contends that the same "would have supported the mitigation evidence submitted to the jury and undermined the aggravator of avoid arrest." Reply, pp. 8-10. Neither of these arguments is persuasive.

Actual innocence means factual innocence. Because petitioner's claim of actual innocence is based on evidence he claims trial counsel should have presented in support of his intoxication defense, this goes to legal innocence, not factual innocence. Petitioner, therefore, fails to show a miscarriage of justice on this basis. See Beavers v.

---

[11] *In addition, post-conviction counsel ineffectiveness cannot serve as cause. Coleman, 501 U.S. at 752 (because there is no constitutional right to representation in state post-conviction proceedings, a petitioner "'bear[s] the risk of attorney error that results in a procedural default'") (citation omitted).*

Saffle, 216 F.3d 918, 923 (10th Cir. 2000) (finding that the miscarriage of justice exception had not been met where petitioner's contentions were legal arguments regarding his intoxication and self-defense).

Regarding petitioner's assertion that he is actually innocent of the death penalty, this fails as well. "In the specific context of a sentencing challenge, the Supreme Court has held actual innocence requires the petitioner to show 'by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under [state] law.'" Brecheen v. Reynolds, 41 F.3d 1343, 1357 (10th Cir. 1994) (citing Sawyer v. Whitley, 505 U.S. 333, 348 (1992)). See also Black, 682 F.3d at 915-16. As the Supreme Court held in Sawyer, "the 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." Sawyer, 505 U.S. at 347. "Thus, even if state law considers the outweighing of mitigating circumstances by aggravating circumstances as an 'element' of a capital sentence, it is not an element for purposes of the actual-innocence inquiry." Black, 682 F.3d at 916.

Petitioner's argument is that his mitigation case would have been strengthened if his resentencing trial counsel had presented more evidence of his intoxication. He also claims that this additional evidence would have undermined one of the four aggravating circumstances the jury found. As in Black, this is an evidence-based challenge that "cannot support the actual-innocence exception to procedural bar." Id.

Having failed to show either cause and prejudice or a fundamental miscarriage of justice, petitioner's ineffectiveness challenges based on the absence of Mr. Johnson's testimony from both the guilt and sentencing stages are procedurally barred.

In addition to his claims regarding Mr. Johnson, petitioner presents another claim which is procedurally barred as well. In his original post-conviction application, petitioner alleged that his trial counsel in the resentencing proceeding were ineffective for failing to present testimony from a neuropharmacologist, and that because appellate counsel did not raise this claim of trial counsel ineffectiveness in his resentencing appeal, he was entitled to relief upon a claim of appellate counsel ineffectiveness. Coddington, 259 P.3d at 839. As respondent notes, the OCCA found that the primary claim raised by petitioner in this instance was one based on appellate counsel ineffectiveness, a claim which the OCCA reviewed on the merits and denied relief. Id. (finding that trial counsel's decision not to present this particular witness may have been "sound trial strategy[,]" but that in any event, petitioner had not shown prejudice). As for trial counsel's ineffectiveness, the OCCA's opinion makes clear that even petitioner acknowledged that this claim had been waived. Id. at 835 n.2. Under these circumstances, respondent has argued that this claim is procedurally barred. Response, pp. 55-64.

Because respondent has asserted procedural bar as an affirmative defense, petitioner has the burden of arguing against its application. Hooks v. Ward, 184 F.3d 1206, 1217 (10th Cir. 1999) ("Once the state pleads the affirmative defense of an independent and adequate state procedural bar, the burden to place that defense in issue

shifts to the petitioner. This must be done, at a minimum, by specific allegations by the petitioner as to the inadequacy of the state procedure."). This he has not done. In his reply, petitioner has responded only to the applicability of a procedural bar to the claims involving Mr. Johnson. Petitioner has made no arguments as to why a procedural bar should not apply to this claim, nor has he attempted to satisfy an exception to its application. Reply, pp. 8-10. Accordingly, the court finds this claim procedurally barred as well.[12]

## Claims Adjudicated by the OCCA

Petitioner's two remaining claims were presented to the OCCA in petitioner's resentencing appeal. The OCCA reviewed the merits of these claims and denied relief. Coddington, 254 P.3d at 713-16. Affording the OCCA substantial deference, as required by both the AEDPA and Strickland v. Washington, 466 U.S. 668 (1984), the court concludes that petitioner is not entitled to relief on these claims.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." Burt v. Titlow, 571 U.S.___, 134 S. Ct. 10, 18 (2013). Whether counsel has provided constitutional assistance is a question to be reviewed under the familiar standard set forth in Strickland, which the OCCA did in denying petitioner relief. To obtain relief, Strickland requires a defendant to show not only that his counsel performed deficiently, but that he was prejudiced by

---

[12] *In addition, the court concludes that petitioner has failed to demonstrate that this claim has merit. In his petition, petitioner has done little more than make minor, passing references to this claim. Petition, pp. 28, 31. He has not presented any related argument regarding why trial counsel was allegedly ineffective in this instance.*

it. <u>Strickland</u>, 466 U.S. at 687. A defendant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." <u>Id.</u> The assessment of counsel's conduct is "highly deferential," and a defendant must overcome the strong presumption that counsel's actions constituted "'sound trial strategy.'" <u>Id.</u> at 689 (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." <u>Id.</u> at 690.

As <u>Strickland</u> cautions, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Id.</u> at 689. Therefore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Id.</u> Within "the wide range of reasonable professional assistance," "[t]here are countless ways to provide effective assistance in any given case[, and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." <u>Id.</u>

As for prejudice, <u>Strickland</u> requires a defendant to show that his counsel's errors and omissions resulted in actual prejudice to him. <u>Id.</u> at 687. In order to make a threshold showing of actual prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In Richter, the Supreme Court addressed the limitations of the AEDPA as specifically applied to a claim of ineffective assistance of counsel that a state court has denied on the merits. The Court held that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Richter, 562 U.S. at 101 (internal quotation marks and citation omitted). The Court bluntly acknowledged that "[i]f this standard is difficult to meet, that is because it was meant to be." Id. at 102.

> [The AEDPA] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

Id. at 102-03 (internal quotation marks and citation omitted). When these limits imposed by the AEDPA intersect with the deference afforded counsel under Strickland, a petitioner's ability to obtain federal habeas relief is even more limited.

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing

professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so[.] The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 562 U.S. at 105 (internal quotation marks and citations omitted).

On direct appeal, petitioner asserted that his trial counsel should have done more to educate the resentencing jury about cocaine addiction and about how his cocaine intoxication at the time of the murder affected his actions. He contended that this information should have been presented through Dr. Smith, who testified in his original trial. See Ground IV, supra. Although petitioner acknowledged that trial counsel had presented another expert in mitigation, he asserted that his testimony was more general and therefore not as good as what could have been presented through Dr. Smith. Petitioner argued that this evidence was crucial to counter the state's assertions that the murder was especially heinous, atrocious, or cruel and that it was committed to avoid arrest or prosecution. Petitioner also asserted that it was classic mitigation evidence that reduced his moral culpability for the murder. *Brief of Appellant, Case No. D-2008-655,*

*at 66-69.* Petitioner makes these arguments here as well, asserting that the OCCA's denial of this claim is contrary to or an unreasonable application of Supreme Court law.[13]

In denying petitioner relief, the OCCA compared the testimony given by Dr. Smith in the first stage of petitioner's original trial with the testimony given by Dr. William Ruwe, the neuropsychologist presented by trial counsel at resentencing. The OCCA found that Dr. Ruwe's testimony was similar in many respects to Dr. Smith's, and that given the nature and focus of the resentencing proceeding, it was reasonable strategy for trial counsel to rely upon Dr. Ruwe's expertise in the presentation of the mitigation case.

> Smith's testimony was presented during the first stage of the first trial, not in mitigation. He reviewed [petitioner's] records, including a neuropsychological examination, a competency evaluation, hair analysis, Children's Hospital and other medical records, drug treatment, DHS and school records, family history, legal history, [petitioner's] statement to police, and the medical examiner and police reports. He also interviewed [petitioner]. Smith's testimony focused on the chemical, physical and psychological effects of cocaine and alcohol on the brain. He discussed the ways in which these substances affected the developing brain. Smith testified that [petitioner] was drug-dependent and addicted to cocaine. He specifically described the effect of cocaine use on various areas of the brain. Smith used [petitioner's] long history of head trauma and injuries, alcohol use, and substance abuse to illustrate the probable effects on [petitioner's] brain development. He testified that [petitioner] was unable to use good judgment, control his behavior, think, or make good decisions.

> Ruwe's mitigation testimony was broader than Smith's, but substantially included the evidence Smith gave. Ruwe reviewed the records Smith reviewed, including Smith's own report and testimony, and conducted his own interview of [petitioner]. During his testimony, Ruwe testified as to Smith's findings and conclusions. Ruwe's testimony regarding alcohol and substance addiction was similar to, and in some ways

---

[13] *Although petitioner references* <u>Chapman</u> *as the relevant Supreme Court case, Petition, pp. 32, 34, it is clear that* <u>Strickland</u> *is the controlling authority.*

more extensive than, Smith's. Ruwe emphasized the effects of substance abuse on the developing brain. Like Smith, he testified about the physical and neuropsychological characteristics of cocaine abuse and addiction on the brain, as well as on brain development. Ruwe discussed at length [petitioner's] probable delay in brain development and deficits in judgment, impulse control and ability to make good decisions. Ruwe explained how these characteristics were affected by [petitioner's] terrible childhood, his history of physical abuse and injuries, his long-term addiction, and his substance abuse shortly before the crime. He explained that these factors combined to ensure that [petitioner] could not make good decisions or use good judgment during his encounter with Hale which led to robbery and murder. Ruwe testified about the ways in which [petitioner's] personality characteristics, influenced by his brain development, were affected by environment. Ruwe's testimony highlighted the ways in which [petitioner's] upbringing and substance abuse reduced his moral culpability.

The record supports our conclusion that counsel's decision not to present Smith's testimony was sound trial strategy. Counsel's focus in the resentencing trial was necessarily different from the trial strategy employed during the first trial. Smith's testimony was offered to show that [petitioner] could not have formed the intent necessary to commit first degree murder. Ruwe's testimony was more expansive, including medical evidence of the effects of cocaine and other substances on [petitioner's] brain, thinking and judgment, and the effects of his entire history and upbringing. Smith's opinion that [petitioner] was too intoxicated to form the intent to commit murder was of minimal relevance in the resentencing trial, which was not concerned with [petitioner's] guilt. The mitigating effect of that testimony was fulfilled by Ruwe's testimony. Counsel's decision to rely on Ruwe's evidence, rather than present Smith's prior testimony, was a viable option and a reasonable strategic decision. "[W]here counsel makes an informed decision to pursue a particular strategy to the exclusion of other strategies, this informed strategic choice is virtually unchallengeable."

Coddington, 254 P.3d at 714-15 (citations omitted). Contrary to petitioner's assertion, there is nothing unreasonable about this determination by the OCCA.

In opening statement, trial counsel told the jury that in order for them to "make a qualified decision about [petitioner's] sentence[,]" they had to know all about him. They had "to know the 24-year-old man that committed this crime, how he became who he was

and . . . who he is today" (2008 Tr. III, 121).  To accomplish this, trial counsel presented eleven witnesses, including Dr. Ruwe.  Through these witnesses, trial counsel told the jury about petitioner's tragic upbringing which fostered his addiction to intoxicants.  The jury learned that for the two years prior to the murder, however, petitioner had maintained a stable life.  He was drug-free, maintained positive relationships (including a friendship with the victim, Mr. Hale), and worked long hours to provide for his fiancé and her children.  But petitioner relapsed, and in December 1996, he underwent a 30-day inpatient drug treatment program.  When he got out in January 1997, he had some success, but before too long, he was out of control again.  He lost his fiancé and their family and he killed his friend while desperately seeking money to maintain his high.

In closing, trial counsel stated, "[Petitioner's] journey through this world is not what any child's journey should be.  He lived a dreadful life . . ." (2008 Tr. VI, 156).  Reviewing the details of petitioner's life, trial counsel reminded the jury of Dr. Ruwe's testimony about how petitioner's history had impacted his development and his battle with addiction, but also how Dr. Ruwe believed that petitioner, having been incarcerated for over a decade, could be a well-behaved prisoner.  Trial counsel concluded by asking the jury for a sentence of life without parole and making the final comment:  "Let the long and difficult journey that has been in his life end there [prison] where he will live every day with the shame of what we [sic] has done, in fairness, sympathy, and mercy" (2008 Tr. VI, 167-68).

From the foregoing, it is clear that trial counsel employed a reasonable strategy through the presented mitigation case, and that Dr. Ruwe's evaluation of petitioner and

his testimony regarding his findings meshed well with it. Accordingly, the court concludes that the OCCA's determination in this instance is reasonable.

Related to this claim, petitioner additionally faults his trial counsel for not including his cocaine impairment at the time of the crime among the mitigating circumstances provided to the jury. The OCCA addressed this claim as well, concluding that the jury was "sufficiently instructed that they could consider [petitioner's] impairment by cocaine addiction in mitigation." Coddington, 254 P.3d at 715. The record supports this determination. Among the twenty-five mitigation circumstances detailed in the jury instructions, which accurately reflected the mitigation case, the jury was told that petitioner had been neurologically harmed by alcohol and illegal drugs, among other things (2008 O.R. V, 827-31). No relief is warranted here.

Petitioner's final challenge concerns trial counsel's failure to object when the trial judge allegedly left the bench during the playing of a video at the resentencing proceeding. Although petitioner does not request relief for the underlying error, the record reflects that the OCCA fully addressed the issue and denied relief because petitioner failed to show prejudice. Coddington, 254 P.3d at 697-704. In making this determination, the OCCA summarized the facts as follows:

> Taking the evidence in the light most favorable to the defendant, the courtroom was darkened. Jurors were facing the video screen, not the bench, watching a 46–minute long videotape. The videotape was [petitioner's] mother's emotionally affecting testimony in mitigation. The parties, and the trial court, had seen the videotape and it was admitted by agreement. No objections were made, on substantive or any other grounds, during the playing of the tape. During this time, the trial judge may have left the courtroom briefly. The judge's recollection is that, if this happened, it was for a minute or two. A defense intern avers that she timed the judge's

> absence at five minutes. Although she and second chair defense counsel both say they saw the trial judge leave, neither they nor the first chair counsel objected at the time or made a record of the incident at any other time during the remainder of the trial. There is no evidence suggesting that any juror saw the trial court leave, if he left, or was affected by the sight.

Id. at 703.  In denying petitioner relief on the related ineffectiveness claim, the OCCA found that just as the underlying claim failed for a lack of prejudice, so did the Strickland claim.  Id. at 715-16.   This is not unreasonable.  See Hanson v. Sherrod, 797 F.3d 810, 839 (10th Cir. 2015) (refusing to analyze a petitioner's ineffectiveness claim based on trial counsel's failure to object to instances of prosecutorial misconduct where the underlying instances of alleged misconduct were without merit), cert. denied, 136 S. Ct. 2013 (2016).  See also Freeman v. Attorney General, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . ."); Snow v. Sirmons, 474 F.3d 693, 724-25 (10th Cir. 2007) (trial counsel was not ineffective for failing to object to certain evidence that the OCCA found admissible); Spears, 343 F.3d at 1249 (trial counsel was not ineffective for failing to object to the giving of a flight instruction where the OCCA found sufficient evidence supporting the instruction).

Having addressed each of the ineffectiveness claims contained in petitioner's Ground VII, the court concludes that no relief is warranted.  These claims are either procedurally barred or without merit or both.

**E.     Ground VIII:         Medical Examiner Testimony.**

Although petitioner's Ground VIII is labeled as a direct challenge to the admission of evidence which petitioner claims violated his right to confront the witnesses against him, petitioner states that this ground is exhausted because it was presented to the OCCA

in the post-conviction application following his resentencing direct appeal. Petition, p. 37. However, in post-conviction, petitioner did not raise an independent confrontation violation. Instead, petitioner raised a layered claim that his appellate counsel was ineffective for not raising an ineffective assistance of trial counsel claim based on trial counsel's failure to object to the admission of the medical examiner's testimony at his resentencing proceeding. *Original Application for Post-Conviction Relief at 40, 59-64.* Because this is the only exhausted claim, the court construes petitioner's Ground VIII in this light and denies relief because petitioner cannot show that the OCCA unreasonably denied him relief on this appellate counsel ineffectiveness claim.[14]

Claims regarding the effectiveness of appellate counsel are governed by Strickland. Milton v. Miller, 744 F.3d 660, 669 (10th Cir. 2014) (citing Smith v. Robbins, 528 U.S. 259, 285 (2000)). In accordance with Strickland, a petitioner alleging appellate counsel ineffectiveness must show (1) that his appellate counsel's actions on appeal were objectively unreasonable and (2) that, but for counsel's unreasonable actions, he would have prevailed on appeal. Robbins, 528 U.S. at 285-86; Miller v. Mullin, 354 F.3d 1288, 1297 (10th Cir. 2004) (quoting Ellis v. Hargett, 302 F.3d 1182, 1186-

---

[14] *On post-conviction, petitioner challenged only the testimony of Dr. Chai Choi, who testified at the resentencing. Original Application for Post-Conviction Relief at 60 ("The admission of the autopsy sketches, photos, and Dr. Choi's testimony based upon Dr. Parker's and/or Dr. Jordan's report violated [petitioner's] right to confront his accusers under the Sixth and Fourteenth Amendments to the United States Constitution and Article II § 20 of the Oklahoma Constitution."). Therefore, to the extent petitioner challenges the testimony of Dr. Fred Jordan who testified in petitioner's original trial or his appellate counsel's actions in his first direct appeal, these claims are unexhausted and anticipatorily procedurally barred. See Ground VII, supra. As to his claim that his trial counsel at resentencing was ineffective for failing to object to Dr. Choi's testimony, the OCCA noted that any such direct challenge was waived. Coddington, 259 P.3d at 838. However, given that this claim is interwoven with his appellate counsel challenge, it is subject to denial on the merits as well.*

87 (10th Cir. 2002)). As previously discussed with respect to petitioner's Ground VII, both Strickland and the AEDPA are highly deferential standards, "and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citation omitted).

When an appellate counsel claim concerns omitted issues, Strickland's first prong requires a showing that counsel unreasonably omitted "nonfrivolous issues." Robbins, 528 U.S. at 285. When counsel has filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim. Id. at 288. Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit. In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . ." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). "This has assumed a greater importance in an era when oral argument is strictly limited in most courts–often to as little as 15 minutes–and when page limits on briefs are widely imposed." Jones, 463 U.S. at 752-53.

In denying petitioner relief, the OCCA concluded that because the underlying confrontation claim was harmless, petitioner's appellate counsel claim failed due to a lack of prejudice. In finding the underlying claim to be harmless, the OCCA noted that petitioner had confessed to the murder and that other "witnesses [had] described the crime scene and the victim's wounds in detail." Coddington, 259 P.3d at 839. See United States v. Garcia, 793 F.3d 1194, 1212 (10th Cir. 2015) ("The admission of evidence barred by the Confrontation Clause requires reversal of the conviction unless

the admission was harmless beyond a reasonable doubt.").[15] Arguing against this conclusion, petitioner asserts that the testimony was "extremely prejudicial" because Dr. Choi testified that Mr. Hale's wounds would have been painful, a consideration for the finding of the especially heinous, atrocious, or cruel aggravating circumstance. Petition, pp. 38-39.

Petitioner has not shown that the OCCA unreasonably denied him relief on this claim. First, even though Dr. Choi gave testimony regarding the pain Mr. Hale most likely felt, the especially heinous, atrocious, or cruel aggravating circumstance was only one of the four aggravating circumstances which the jury found to support petitioner's death sentence. Second, irrespective of whether or not Dr. Choi conducted the autopsy of Mr. Hale, she clearly had the expertise to give her opinion about the issue of pain after reviewing the autopsy report and the many pictures of Mr. Hale's injuries. And finally, this testimony was not something that was not otherwise obvious and known. The undisputed evidence was that petitioner pounded Mr. Hale's head with a hammer multiple times, but that Mr. Hale did not succumb to his injuries until the following day. When Mr. Hale's son found him several hours after the attack, he was not in the kitchen where petitioner assaulted him, but in his bedroom mumbling and moaning in pain. Under these circumstances, the OCCA reasonably denied petitioner relief because even if

---

[15] *Addressing petitioner's claim through the lens of harmless error, the OCCA assumed that a confrontation violation occurred. However, "[t]he Supreme Court has never held that the Confrontation Clause applies at capital sentencing."* <u>Carter v. Bigelow</u>, *787 F.3d 1269, 1294 (10th Cir. 2015).* <u>See also</u> <u>Wilson v. Sirmons</u>, *536 F.3d 1064, 1111 (10th Cir. 2008) (stating "that it is far from clear whether the Confrontation Clause even applies at capital sentencing proceedings") (internal quotation marks omitted) (citation omitted).*

appellate counsel had raised a trial counsel ineffectiveness claim based on Dr. Choi's testimony, it would not have affected the outcome of his resentencing appeal.

Ground VIII is denied.

**F.      Ground IX:          Sleepy Juror.**

In his Ground IX, petitioner asserts that his constitutional rights were violated by a juror who appeared to be nodding off during testimony in the guilt stage of his original trial.  Petitioner faults the trial court for not replacing the juror with an alternate when this conduct was made known.  He also faults his trial counsel for failing to seek the juror's removal.  Petitioner raised this claim in his first direct appeal.  The OCCA denied relief.  <u>Coddington</u>, 142 P.3d at 445-46.  For the following reasons, the court likewise denies relief.

The facts underlying this claim are undisputed.  As set forth by the OCCA in its opinion, the facts are as follows:

> On the first day of witness testimony, during the examination of Scott Cox, defense counsel informed the trial court that Juror Muller appeared to be "nodding off and sleeping. She's about to fall out of her chair." Defense counsel asked the trial court to watch the juror and, at break, to talk to her. Assistant District Attorney Reid also noted the same conduct. The trial court watched the juror and a short while later, the trial court called the attorneys to the bench and stated "[s]he is nodding off ...". At defense counsel's request, the trial court spoke with Juror Muller in chambers. During this colloquy, Juror Muller told the trial court she was feeling strange and "not very well;" she thought it was something to do with her blood sugar. Juror Muller told the trial court she was having difficulty with her vision and walking.

> Juror Muller tested her blood sugar in the presence of the trial court, defense counsel and counsel for the State, and determined it was high. When asked if there was anything she could do to bring it down, she told the trial court exercise was all that she could do.

The trial court allowed the parties to question Juror Muller and her answers revealed she felt she had heard all of the questions asked and answers given, did not think she had missed anything, and felt she could remain on the jury and be alert and attentive. She admitted to defense counsel that, in addition to her sleepiness, she had an upset stomach and a little headache and that it had been "gradually getting worse today."

After the parties questioned Juror Muller, defense counsel asked the trial court to continue to observe her and then to "revisit the issue ... at 1:30" to see how she was feeling. Defense counsel stated, "I think we ought to go on. I mean, let's keep putting witnesses on and if she starts nodding off again then we may have to stop it, Judge. ...." The trial court again agreed to keep an eye on her.

Following cross-examination of the witness, court recessed for lunch and the jurors were asked to return at 1:30. When the jury returned, the trial court told the parties, "[I]nformally I spoke with Juror Muller. She insists that she's doing just fine." Defense counsel asked the trial court to continue to watch her. The record contains no further specific references to Juror Muller.

Coddington, 142 P.3d at 445 (footnote omitted).

In denying petitioner relief on this claim, the OCCA found that although the trial court had the statutory authority to remove the juror, its failure to do so did not amount to an abuse of discretion. See Okla. Stat. tit. 22, § 601a (permitting the impanelment of additional jurors and authorizing the trial court to replace an ill juror with an alternate). The OCCA arrived at this conclusion by considering the following circumstances: (1) the absence of an objection from defense counsel; (2) the lack of conclusive evidence that the juror had in fact been sleeping; and (3) a silent record which indicated no further issues with this particular juror. Coddington, 142 P.3d at 446. Regarding petitioner's related ineffectiveness claim, the OCCA found as follows:

While the trial court might properly have removed Juror Muller if the record conclusively showed she was sleeping or was too ill to continue, defense counsel specifically stated the trial "ought to go on" and did not request the trial court to remove her as a matter of trial strategy. In hindsight, it may appear to [petitioner] that his defense counsel's decision to give this juror another chance was not appropriate, but that is not sufficient to meet the test for ineffective assistance of counsel established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This Court does not evaluate trial strategy in hindsight. Woodruff v. State, 1993 OK CR 7, ¶ 16, 846 P.2d 1124, 1133, cert. denied, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). Further, the record does not establish this juror missed any of the testimony due to inattentiveness or illness and [petitioner] has not shown he was prejudiced by his trial counsel's failure to request her removal from the jury.

Id.

In support of his request for relief, Petitioner references three Supreme Court cases: Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 555 (1976), for the proposition that "[t]he trial judge bears the responsibility of protecting" his right to a fair trial; Furman v. Georgia, 408 U.S. 238 (1972), for the proposition that capital cases require "'heightened reliability'"; and Strickland. Petition, pp. 46-48. Petitioner has not shown, however, how the OCCA's decision is contrary to or an unreasonable application of any of these cases.

The bottom line is that petitioner's claim lacks a factual basis. As the OCCA found, there is no evidence that the juror was actually sleeping or that she missed any of the presented evidence. Moreover, after the juror was thoroughly questioned about her condition and what affect it might have on her ability to continue her service as a juror, defense counsel, an experienced capital litigator,[16] proposed the following plan of action:

---

[16] See Fields v. Gibson, 277 F.3d 1203, 1209 (10th Cir. 2002) (referring to defense counsel's supervisory position in the litigation division of the Oklahoma County Public Defender's Office and his status as "the second most experienced death penalty lawyer at the PDO").

I move we advise her to tell you if her health condition is not getting better, that you observe her, and then we revisit the issue maybe at 1:30 or something and see how the lady is feeling. I think we ought to go on. I mean, let's keep putting witnesses on and if she starts nodding off again then we may have to stop it, Judge. But I move that you say, ma'am, tell us if you continue to get worse, maybe have a report on the lunch break, and then maybe revisit it again at 1:30 and we'll see.

(2003 Tr. III, 80-81, 90-100). In accordance with this plan, the trial judge informed the parties after lunch that he had spoken with the juror and "she's doing just fine" (2008 Tr. III, 113-14). The court has no doubt that after this incident, the juror was monitored by all parties, and because the record reflects no further discussion of this issue, it can be assumed that no other incidents arose. There is nothing in this scenario that causes the court to question whether the trial court or petitioner's trial counsel violated petitioner's constitutional rights.[17] The OCCA's determination of the claim is not contrary to or an unreasonable application of Supreme Court law.

### G.    Ground X:          Evidence Supporting the Murder to Avoid Arrest or Prosecution Aggravating Circumstance.

In Ground X, petitioner contends that the murder to avoid arrest or prosecution aggravating circumstance, one of the four aggravating circumstances supporting his death sentence, is not supported by constitutionally sufficient evidence.[18]  Petitioner raised this

---

[17] *Regarding petitioner's reference to Furman, respondent aptly points out that because petitioner received a new sentencing proceeding, petitioner has no argument that this juror's service denied him a reliable sentencing proceeding. Response, p. 72.*

[18] *In footnote 5, petitioner asserts that he has an additional basis for relief. Citing Harrison v. United States, 392 U.S. 219 (1968), petitioner contends that his testimony from his first trial, testimony which as discussed herein lends support to the jury's finding of the avoid arrest aggravator, should not have been admitted at his resentencing. This claim, however, has never been presented to the OCCA. It is therefore unexhausted and subject to an anticipatory procedural bar. See Ground VII, supra. The court additionally concludes that this claim lacks*

claim in his resentencing appeal. The OCCA addressed the merits and denied relief. Coddington, 254 P.3d at 705-06. Because petitioner has not shown that the OCCA's decision is unreasonable, relief must be denied.

In reviewing petitioner's claim, the OCCA applied the following standard: "whether, in the light most favorable to the State, any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." Id. at 705. This is the same standard mandated by Lewis v. Jeffers, 497 U.S. 764, 781-83 (1990). As the Supreme Court recognized in Jeffers, "[l]ike findings of fact, state court findings of aggravating circumstances often require a sentencer to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Id. at 782 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Thus, this court "'must accept the jury's determination as long as it is within the bounds of reason.'" Lockett v. Trammel [sic], 711 F.3d 1218, 1243 (10th Cir. 2013) (quoting Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005)). This standard of review is highly deferential to the jury's verdict, but when a layer of AEDPA deference is added to it, petitioner's ability to obtain relief is all the more difficult. See Hooks v. Workman, 689 F.3d 1148, 1166 (10th Cir. 2012) ("We call this standard of review 'deference squared.'") (citation omitted).

When reviewing the evidentiary sufficiency of an aggravating circumstance, the court looks to Oklahoma substantive law to determine the aggravator's defined

---

merit because it is based on petitioner's contention that his confession was illegally obtained. Because the court has found otherwise and denied relief on this related claim, see Ground V, supra, petitioner's Harrison claim fails as well.

parameters. Hamilton v. Mullin, 436 F.3d 1181, 1194 (10th Cir. 2006). With respect to the murder to avoid arrest or prosecution aggravating circumstance, Oklahoma law requires the prosecution to show that petitioner "committed a predicate crime, separate from [the] murder, and killed to . . . avoid arrest or prosecution for that predicate crime." Coddington, 254 P.3d at 705. "'[A] defendant's intent is critical to a determination of whether he killed to avoid arrest or prosecution.'" Id. at 706 (quoting Wackerly v. State, 12 P.3d 1, 14 (Okla. Crim. App. 2000). In petitioner's case, the state alleged robbery as the predicate crime. The state contended that petitioner killed Mr. Hale to avoid arrest for taking $525 from him. Coddington, 254 P.3d at 705.

In denying petitioner relief, the OCCA addressed petitioner's concerns and held as follows:

> [Petitioner] argues that his testimony from the first trial cannot support this aggravating circumstance. He testified that he left Hale's house without calling police because he did not want to get caught, and agreed that he wanted to avoid arrest or prosecution. He also testified, and told police, that he hit Hale with the hammer first, and grabbed the cash from Hale's pocket just before he left. [Petitioner] said he thought Hale was dead when he left the scene. [Petitioner] argues that taken together these statements do not provide sufficient proof of a predicate crime. He claims this merely reflects how [he] felt when he left the scene of the murder, but does not show that he killed Hale to avoid being caught for robbery. He insists that robbery cannot be the predicate crime because he had already hit Hale before he robbed him. In similar circumstances, this Court found that a murder occurring contemporaneously with a robbery was nevertheless distinct from it, because evidence showed the defendant intended to rob the victim and was prepared to kill to get the money he sought. Wackerly v. State, 2000 OK CR 15, ¶¶ 40–41, 12 P.3d 1, 14. Evidence here also shows that [petitioner], who was in the middle of a string of robberies at the time of the crime, went to Hale's house to borrow money, intended to get money, attacked Hale after Hale refused to loan him money, and robbed him before leaving. Sufficient evidence supports a conclusion beyond a reasonable doubt that [petitioner] committed the predicate crime of robbery.

Sufficient evidence also supports a conclusion beyond a reasonable doubt that [petitioner] killed Hale to avoid arrest or prosecution for the robbery. "[A] defendant's intent is critical to a determination of whether he killed to avoid arrest or prosecution." Wackerly, 2000 OK CR 15, ¶ 42, 12 P.3d at 14. Ample evidence showed that Hale knew [petitioner] well and could identify him. [Petitioner's] statements to police, as well as his testimony at his first trial, show that he wanted to avoid being caught for this robbery. This was supported by evidence that [petitioner] also attempted to avoid being arrested for the other robberies he committed during this same period of time. Direct and circumstantial evidence support the jury's finding of this aggravating circumstance. Wackerly, 2000 OK CR 15, ¶ 43, 12 P.3d at 14–15.

Coddington, 254 P.3d at 705-06.   Petitioner makes these same arguments here.

The crux of petitioner's claim is that there was no predicate crime.  He argues that because he came to Mr. Hale's home for a loan and without any criminal intent, and because he did not take Mr. Hale's money until after he killed him, the evidence supporting the avoid arrest aggravator is not only insufficient but totally absent. Downplaying the damaging statements he made during his own testimony, petitioner asserts that "[his] words do not establish he committed the murder to avoid arrest and prosecution, . . . [but only that] he did not call the police after the murder because he did not want to be arrested."  Petition, p. 50.  Petitioner argues that how he felt and why he left the scene after the murder are irrelevant.

Ultimately, what petitioner asks this court to do is to invalidate the jury's verdict and the OCCA's decision because his version of the events shows that the robbery was nothing more than an afterthought.  This the court cannot do.  In addition to the fact that this court must be doubly deferential in its review of this claim, the Jeffers/Jackson standard by which petitioner's claim is evaluated is viewed not in the light most favorable

to petitioner, but "'in the light most favorable to the prosecution . . . .'" <u>Jeffers</u>, 497 U.S. at 781 (quoting <u>Jackson</u>, 443 U.S. at 319). Despite petitioner's claims that he had no intent to rob or kill Mr. Hale, the evidence was sufficient for the jury to find otherwise. When petitioner came to Mr. Hale's home, he was on a mission for money to buy more cocaine and he had already robbed at least one business for that purpose. Even if petitioner went to see Mr. Hale in hopes of getting a loan, and even if the jury believed this, a rationale trier of fact could have still found that when Mr. Hale refused to give him money, petitioner went to his backup plan. The fact that petitioner left his knife in the car (the knife he used to rob several businesses before and after Mr. Hale's murder) does not make this finding any less rational. The evidence showed that Mr. Hale was an elderly person who was not in the best of health, whereas petitioner was a young man of twenty-four. Petitioner did not need a weapon to get Mr. Hale's money. However, if petitioner had done that, simply assaulted Mr. Hale to get money, Mr. Hale could have survived and called the police, easily identifying petitioner as the perpetrator. So by killing Mr. Hale, with more than one strike of a hammer to his head, the jury could rationally find that petitioner killed Mr. Hale to avoid arrest or prosecution. Ground X does not state a basis for relief.

### H.    Ground XI:    <u>Roper</u>[19] and Evidence of Juvenile Offenses Presented in Support of the Continuing Threat Aggravating Circumstance.

Petitioner's Ground XI is a challenge to the state's use of his juvenile offenses to support the continuing threat aggravator. Petitioner contends, as he did in his

---

[19] <u>*Roper v. Simmons*</u>, *543 U.S. 551 (2005).*

resentencing appeal, that this is prohibited by the Supreme Court's decision in <u>Roper</u>.[20]

Relying on its decision in <u>Mitchell v. State</u>, 235 P.3d 640 (Okla. Crim. App. 2010), the

OCCA denied relief on this claim. <u>Coddington</u>, 254 P.3d at 707. Because petitioner has

not shown that the OCCA's decision is contrary to or an unreasonable application of

<u>Roper</u>, he has not demonstrated his entitlement to relief.

In <u>Roper</u>, 543 U.S. at 578, the Supreme Court held that "[t]he Eighth and

Fourteenth Amendments forbid imposition of the death penalty on offenders who were

under the age of 18 when their crimes were committed." In denying petitioner relief, the

OCCA relied on its decision in <u>Mitchell</u> wherein it addressed this issue as a case of first

impression. <u>Coddington</u>, 254 P.3d at 707. In <u>Mitchell</u>, the OCCA held as follows:

> This Court has consistently held that evidence of unadjudicated bad
> acts, non-violent bad acts and juvenile offenses are admissible in a capital
> case to prove a defendant constitutes a continuing threat to society.
> Nothing in the language of <u>Roper</u> suggests that the State is prohibited from
> relying on prior juvenile adjudications to support an aggravating
> circumstance.

<u>Mitchell</u>, 235 P.3d at 659 (citation omitted). Faulting the OCCA for this interpretation of

<u>Roper</u>, petitioner contends that "<u>Roper</u> *should* operate to preclude the use of juvenile

adjudications to support aggravating factors in a capital sentencing proceeding." Petition,

p. 55 (emphasis added).

---

[20] *In footnote 8, petitioner makes the additional claim that his trial counsel was ineffective for not raising an objection at resentencing based on <u>Roper</u>. While asserting that this claim should not be reviewed on the merits, respondent additionally argues that it can be denied on the merits. The court concludes that denial on the merits is the most efficient course. Because <u>Roper</u> does not preclude the admission of juvenile offenses to prove the continuing threat aggravator, the objection would have been overruled even if trial counsel had objected on this basis. Thus, there is no merit to this ineffectiveness claim.*

Roper does not address the use of juvenile adjudications in capital proceedings, and petitioner's argument that it should be so applied is not a basis for habeas relief. The OCCA's decision cannot be deemed unreasonable because it failed to extend the principles espoused in Roper. The OCCA's decision is measured against Supreme Court holdings, not general legal principles that may be extracted from them, and those holdings are to be narrowly construed. Fairchild v. Trammell, 784 F.3d 702, 710 (10th Cir. 2015). The OCCA's decision is not contrary to or an unreasonable application of Roper. See Mitchell, 2016 WL 4033263, at *7-8 (rejecting this same claim); Dodd v. Workman, No. CIV-06-140-D, 2011 WL 3299101, at *57-58 (W.D. Okla. Aug. 2, 2011) (rejecting a similar Roper claim), rev'd on other grounds, Dodd v. Trammell, 753 F.3d 971 (10th Cir. 2013).

## I.     Ground XII:        Juror Misconduct.

In his final ground, petitioner asserts that he is entitled to relief because two jurors in his first trial lied during voir dire. Like his Ground VIII, petitioner states that this issue is exhausted because it was presented to the OCCA in the post-conviction application following his resentencing appeal. Petition, p. 59. On post-conviction, petitioner claimed that his appellate counsel in his first direct appeal was ineffective for failing to investigate these jurors. The OCCA addressed the merits of the appellate counsel claim and denied relief. The OCCA procedurally barred the underlying substantive issue. Coddington, 259 P.3d at 835-37.

Petitioner's underlying claim concerns Jurors Berry and Doyle. In discussing the issue of addiction with the prospective jurors, defense counsel asked Juror Berry for her

thoughts. In her response, Juror Berry included a statement that she'd "never had any personal experiences with anybody on drugs" (2003 Tr. II, 131). Because Juror Berry's father died in a drug/alcohol related accident of his own making, petitioner asserts that Juror Berry's statement was "an outright attempt to conceal [her] prejudices against drug and alcohol abusers." Petition, pp. 60, 61-62. As for Juror Doyle, petitioner asserts that he also hid his drug/alcohol prejudices when he failed to disclose prior DUIs. Petition, pp. 58-59. Petitioner argues that had this information been made known at trial, these jurors would have been subject to removal for cause.

In denying petitioner relief, the OCCA repeatedly stressed the claim it was deciding:

> The issue raised . . . is not whether any or all of these six jurors were less than candid in their responses; nor is it whether trial counsel, had she known of these misrepresentations, would have challenged any of these jurors for cause or through a peremptory challenge. The issue before the Court is whether appellate counsel's failure to investigate these jurors and raise any issues resulting from that investigation on direct appeal, raises a substantial likelihood that the result of the proceeding would have been different. In conducting this review, this Court is focusing on [petitioner's] conviction as the outcome which would have been affected by different actions on appellate counsel's part.

> [Petitioner] apparently fails to understand these limitations. In addition to claiming ineffective assistance of appellate counsel in this proposition, he claims that he was denied his right to fully conduct *voir dire*, and his right to an impartial jury, by what he characterizes as material omissions in the responses of three (and particularly two) of the six jurors. This is not the question before the Court. These substantive issues have been waived.

> . . . .

We repeat, whether the responses were inaccurate or whether trial counsel might have used peremptory challenges based on this information is not the issue before the Court.

Coddington, 259 P.3d at 836, 837.[21]  Acknowledging the high standard imposed by Strickland, the OCCA noted that "[a]ppellate counsel need not raise every non-frivolous issue" and "[a] strong presumption exists that, where counsel focuses on some issues to the exclusion of others, this reflects a strategic decision rather than neglect." Id. at 835-36 (citing Richter, 562 U.S. at 109 and Jones, 463 U.S. at 753-54).  In addition, because appellate counsel had succeeded in getting petitioner's death sentence reversed and remanded for a new sentencing, the OCCA found that "[g]iven this evidence of effective representation, it will be difficult for [petitioner] to show that appellate counsel's performance was deficient." Coddington, 259 P.3d at 836.  Ultimately, the OCCA denied relief for two reasons: (1) because appellate counsel has no duty to investigate jurors; and (2) because petitioner failed to demonstrate that the jurors in question had "any bias or partiality for or against [his] case or [him]." Id. at 836-37.  Petitioner has not shown that this determination is unreasonable.

The sum of petitioner's argument is one of prejudice.  He claims that the jurors' errors are so grave that he simply must be granted relief.  This argument fails on multiple grounds.  First, the AEDPA standard of review precludes it.  In addition to the expansive deference that must be afforded the OCCA's determination, relief is required only if the

---

[21] *The OCCA's reference to six jurors includes four jurors challenged by petitioner in his post-conviction claim but not raised here.  Petition, pp. 56-57.  Also, since appellate counsel was successful in getting petitioner a new sentencing proceeding, the obvious focus for the OCCA would be petitioner's murder conviction.  Coddington, 142 P.3d at 462.*

OCCA's decision amounts to an extreme malfunction of the criminal justice system. See Davis v. Ayala, 576 U.S. ___, 135 S. Ct. 2187, 2202 (2015) ("The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems.") (internal quotation marks and citation omitted). This cannot be said of the OCCA's opinion. Second, the Strickland standard, which requires a showing of both deficient performance and prejudice, precludes it. Strickland, 466 U.S. at 687. Although petitioner has presented an argument for prejudice, with regard to deficient performance, petitioner has stated only that a reasonable investigation would have uncovered this juror claim. However, Strickland cautions against this type of hindsight distortion, while recognizing that "[t]here are countless ways to provide effective assistance in any given case." Id. at 689. Petitioner does not argue that appellate counsel should have somehow been alerted to a potential claim, nor does he make any assertion that juror investigations are required in every appeal. In addition, petitioner has not even offered up a critique of appellate counsel's brief in an effort to show that this juror claim was more worthy than the claims that were presented. As the OCCA noted, since appellate counsel was able to obtain sentencing relief, petitioner would be hard pressed to even make this argument.

And finally, even petitioner's prejudice argument fails to demonstrate his entitlement to relief. The OCCA found that petitioner had failed to show that Jurors Berry and Doyle had any bias or partiality to either side based on their drug/alcohol experiences. While petitioner has inferred that their experiences would have made them unsympathetic jurors, one can just as easily infer that their experiences made them sympathetic jurors. In addition, the court notes that petitioner's support for his

claim regarding Juror Berry is in the form of a hearsay affidavit which is inherently unreliable, see Neill v. Gibson, 278 F.3d 1044, 1056 (10th Cir. 2001) (finding no abuse of discretion in refusing to consider hearsay affidavits by investigators), and as for Juror Doyle, the record does not support petitioner's contention that he was dishonest when he failed to respond to the trial court's inquiry about ever being in a court of law or coming before a judge as a witness or a party (2003 Tr. I, 108). Based on the evidence petitioner has provided, Juror Berry did have two prior DUI arrests, but his convictions were the result of bond forfeitures due to his failure to appear. Petition, pp. 58-59. So when the trial court asked if he had ever been in a court of law or before a judge, Juror Berry was not dishonest in remaining silent. The question posed would not necessarily have prompted any disclosure of his prior DUI arrests.

Under these circumstances, it was reasonable for the OCCA to conclude that "[a]ppellate counsel was not ineffective for failing to investigate jurors' backgrounds." Coddington, 259 P.3d at 837. See McDonough Power Equipment, Inc., v. Greenwood, 464 U.S. 548, 556 (1984) (holding that in order to obtain a new trial, a petitioner "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause"). As for the underlying claim, it is, as the OCCA found, procedurally barred because appellate counsel ineffectiveness does not excuse petitioner's default.

## IV. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery as well as a motion for an evidentiary hearing. Docs. 30 and 31. The court concludes that both should be denied.

In order to conduct discovery, Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts requires petitioner to show good cause. In Bracy v. Gramley, 520 U.S. 899, 908-09 (1997), the Supreme Court acknowledged that "good cause" requires a pleading of specific allegations showing a petitioner's entitlement to relief if the facts are fully developed.

Petitioner's discovery request is extensive. He requests any information known to the trial court or the court clerk regarding any communications with the jurors; the prosecution's entire file; all information concerning Jurors Berry and Doyle; all information related to his intoxication at the time of the crime and his confession; and any exculpatory material. He also requests that he be allowed to depose Jurors Berry, Doyle, and Muller; law enforcement officers Smart, DeSpain, and Weaver; and Kenneth Johnson. Although petitioner makes reference to the medical examiner who performed the autopsy of the victim, the court notes that he makes no request related to him.

Regarding his intoxication, petitioner seeks more information from the law enforcement officers who interacted with him the day he was arrested and confessed. However, as respondent has pointed out, petitioner was afforded a hearing on the voluntariness of his confession. At that hearing, and in the first trial, both Smart and DeSpain testified and were subject to cross-examination by petitioner. As for Weaver, he testified at the resentencing proceeding and was subject to cross-examination by

petitioner at that time. Doc. 41 at 2. Petitioner has not shown what further information could be gathered from these individuals. In addition, regarding Mr. Johnson, petitioner has not shown how deposing him would lead to information supporting a claim for relief. In Ground VII, petitioner has alleged that his trial counsel was ineffective for failing to present Mr. Johnson for testimony, and he has supported this claim with a transcript of an interview which was apparently conducted at the time of trial and contained in trial counsel's files. Petitioner's Exhibit 13. However, petitioner has not shown what additional information could be gained from a deposition of Mr. Johnson, nor has he shown how the same would support a relief on a claim this court has determined to be procedurally barred.

Petitioner's Grounds IX and XII involve three jurors who sat on the jury in petitioner's original trial in 2003. In Ground IX, petitioner has complained about Juror Muller's sleeping during the trial, and in Ground XII, petitioner has asserted that Jurors Berry and Doyle lied during voir dire. With respect to Ground IX, the court has concluded that it lacks factual support; however, what petitioner seeks to discover with respect to Juror Muller does address this deficiency. Petitioner wants to depose Juror Muller to discuss her alertness during trial and her medical condition, but this was all addressed during the trial. Upon questioning by the trial court and the parties, it was discovered that Juror Muller was having trouble with her diabetes that particular morning. However, she did not miss any evidence and by afternoon she was feeling fine (2003 Tr. III, 91-100, 113). Petitioner has not given this court any reason to discount how the matter was handled at trial, nor has he shown how pursuing this issue some

thirteen years later will bring about any different result. Regarding Jurors Berry and Doyle, petitioner wants to depose them and discover more information about the extent of their alleged bias. In Ground XII, the court has rejected petitioner's argument that his appellate counsel was ineffective for failing to investigate these jurors and found the underlying juror misconduct claim to be procedurally barred. Petitioner has not shown how further investigation into Jurors Berry and Doyle affects these determinations and/or his entitlement to relief. Therefore, this request is also denied.

In addition to these specific requests, petitioner has made general requests regarding juror communications, the prosecution's file, and exculpatory material. The court denies these requests because they are too broad and unsupported by specific allegations as required by Bracy.

As for an evidentiary hearing, petitioner requests that he be granted one to further develop his Ground V which concerns the admissibility of his videotaped confession. However, the court has denied this ground for relief, concluding that petitioner has failed to show that the OCCA's determination of the issue is an unreasonable determination of law or fact under Section 2254(d). In accordance with Pinholster, 563 U.S. at 181, the court's review of this claim is limited to the record that was before the OCCA at the time it rendered its decision. Having failed to satisfy Section 2254(d), petitioner is not entitled to an evidentiary hearing on this claim. Jones v. Warrior, 805 F.3d 1213, 1222 (10th Cir. 2015).

### V.  Conclusion.

Having concluded petitioner's arguments do not establish a right to relief, his petition for writ of habeas corpus is **DENIED**, as are his requests for discovery and an evidentiary hearing.  [Doc. Nos.  29, 30 and 31].  Judgment will be enter accordingly.

**IT IS SO ORDERED**.

Dated this 15th day of September, 2016.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE